IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHARLES NORWOOD,
aka MS. CHELSY,

                                                                                  OPINION and ORDER

                    Plaintiff,

                                                                                   11-cv-507-bbc

     v.

DR. TOBIASZ, DR. GARBLEMAN,
DR. CALLISTER, MR. POLLARD,
JAMES MUENCHOW, CYNTHIA THORPE,
MICHAEL MEISNER, DON STRAHOTA,
WELCOME ROSE, MELISSA ROBERTS
and SCHWOCHERT,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

       Plaintiff Charles Norwood, a prisoner at the Waupun Correctional Institution, has filed this civil action alleging that defendant Department of Corrections employees are violating her[1] Eighth Amendment and Fourteenth Amendment rights by failing to treat her for Gender Identity Disorder. The parties have briefed plaintiff's motion for preliminary injunctive relief, dkt. #1. After considering the parties' submissions, I will stay a decision on the motion pending supplemental submissions from defendants.

       For the sole purpose of considering plaintiff's motion for a preliminary injunction, I find

---

   [1] Plaintiff refers to herself as a "transsexual female" so throughout this opinion I will refer to her using female pronouns.

1

from the parties' submissions that the following facts are material and undisputed, unless otherwise noted.

UNDISPUTED FACTS

Plaintiff Charles Norwood is an inmate at the Waupun Correctional Institution. He has a diagnosis of Axis I disorders of Depressive Disorder NOS and Polysubstance Dependence, and an Axis II disorder of Personality Disorder NOS w/ Antisocial and Borderline Features. She has a significant history of self-harm attempts. Plaintiff is housed in the Health and Segregation Complex at the prison, which houses inmates in segregation status.

Plaintiff, who has male characteristics, states that she is a transsexual female who suffers from Gender Identity Disorder[2] (defendants argue that plaintiff has no submitted admissible evidence proving this, although plaintiff states that she and her family and friends refer to plaintiff as "Miss," "Ms," "Ms. Charles or "Ms Chelsy"). Gender Identity Disorder is a mental disorder characterized by a strong and persistent cross-gender identification and discomfort with one's sex, or sense of inappropriateness in the gender role of that sex, that causes clinically significant distress or impairment in social, occupational, or other important areas of functioning. Plaintiff has never had a diagnosis of Gender Identity Disorder from any of her treating mental health professionals at the prison.

In the past six months, plaintiff has met with prison mental health staff on at least eight

---

[2] The parties use the terms Gender Identity Disorder and Gender Identity Dysphoria interchangeably. I will refer to the disorder as Gender Identity Disorder throughout this opinion.

occasions. On June 29, 2011, plaintiff was placed in observation status after alleging that prison staff was causing her "mental harm" because of the "lack of professional agreement" over her belief that she should have a diagnosis of Gender Identity Disorder. Plaintiff has not had such a diagnosis and she has not been receiving mental health services directly related to this disorder. On July 7, 2011, plaintiff's treating psychologist, defendant Tobiaz, noted:

> Mr. Norwood's situation is being monitored/addressed in an appropriate manner. Consideration on diagnosis (Gender Identity Disorder) will [be] addressed and based upon the assessment, file review, self-report, and the clinical literature. It still remains unclear if Mr. Norwood fully understands the diagnosis or the misperceptions of what "treatment" for GID generally is and is not.

According to plaintiff's last clinical interview on September 2, 2011, plaintiff did not appear to be at risk of self-harm. If inmates are dangerous to either themselves or others, they may be placed in observation status to iensure their safety and the safety of others. Plaintiff's last reported self-harm attempt occurred in May 2010, almost a year before she first requested treatment for Gender Identity Disorder in March 2011.

The Department Division of Adult Institutions has promulgated a policy entitled "Health Care Treatment of Gender Identity Disorder," DAI Policy #500.70.27. This is a new policy that was approved on November 10, 2011, with an effective date of December 19, 2011. The purpose of this policy is "to provide appropriate treatment for inmates meeting DSM criteria for a diagnosis of Gender Identity Disorder."

Under the Gender Identity Disorder policy, prison health care staff who receive requests from inmates for any form of treatment or accommodations for Gender Identity Disorder are to forward the requests to Dr. Kevin Kallas, the department's Mental Health Director. After

a request for treatment is made, Kallas may assign a department psychiatrist or Psychological Services Unit staff to conduct an initial evaluation of the inmate to help determine whether a more specialized evaluation is needed.

Despite not having a diagnosis of Gender Identity Disorder, plaintiff has requested treatment for the disorder. After plaintiff's request for treatment, Kallas requested that Psychological Services Unit staff at the Waupun prison conduct an initial evaluation of plaintiff pertaining to the disorder.

On November 10, 2010, defendant Dr. Ryan Tobiasz attempted to conduct an initial interview with plaintiff. However, plaintiff refused to be seen out of her cell to talk with Tobiasz. Also, when previously asked about the matter, plaintiff informed Tobiasz that she was not going to discuss her Gender Identity Disorder and that it was now up to the court to decide. (Plaintiff disputes this by stating that she has been denied "any and all exams, proper referrals, etc.")

The Department's Gender Identity Disorder policy also allows the department to utilize an outside consultant with expertise in diagnosis and treatment of the disorder. The department has secured the services of Cynthia S. Osborne to serve as an outside consultant.

Osborne planned to make her first visit to Wisconsin in mid-December 2011 to interview selected inmates who have requested Gender Identity Disorder treatment.[3] If plaintiff would cooperate with the initial interview with Psychological Services Unit staff, the

---

[3] Defendants submitted their proposed findings of fact in mid-November 2011, so their proposed findings discuss the Department's and Osborne's future plans.

4

Department would have arranged to have Osborne interview plaintiff in December and make a recommendation. Though Osborne's recommendations are not binding on the department, both the Gender Identity Disorder Committee and plaintiff's treating staff would consider those recommendations and implement any necessary medical care. (The parties have not proposed any supplemental facts showing whether plaintiff saw Osborne.)

Plaintiff seeks counseling. She believes that the "lowest level [of treatment] that will alleviate much stress where I am comfortable in my skin and with my maleness" is (1) to be allowed to shave her face, legs and underarms; (2) to be allowed to purchase women's underwear; and (3) be allowed to have a "real life experience as a woman in prison" and eventually undergo hormone treatment.

Razors are not permitted in segregation at the prison. Razorless shaving cream may be purchased from the canteen and inmates may sign up for and receive haircuts or beard shaving. Women's undergarments or other apparel are not allowable property items in segregation at the prison.

Hormone therapy is a physical intervention that masculinizes or feminizes the body by administration of hormones, such as estrogen to biologic males, with the purpose of reducing gender dysphoria and minimizing the risk of depression, anxiety or impairments in functioning. Hormone therapy must be prescribed by a physician, and only after proper diagnosis and assessment by a mental health professional. It would be contrary to both the department's Gender Identity Disorder policy and current mental health standards of care to administer hormone therapy to plaintiff before an evaluation had been completed and without a

recommendation from a mental health professional.

## DISCUSSION

"[T]he granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." <u>Roland Machinery Co. v. Dresser Industries</u>, 749 F.2d 380, 389 (7th Cir. 1984). The standard applied to determine whether a plaintiff is entitled to preliminary injunctive relief is well established:

> A district court must consider four factors in deciding whether a preliminary injunction should be granted. These factors are: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction will disserve the public interest.

<u>Pelfresne v. Village of Williams Bay</u>, 865 F.2d 877, 883 (7th Cir. 1989). At the threshold, plaintiff must show some likelihood of success on the merits and the probability that irreparable harm will result if the requested relief is denied. If plaintiff makes both showings, the court then moves on to balance the relative harms and public interest, considering all four factors under a "sliding scale" approach. <u>In re Forty-Eight Insulations, Inc.</u>, 115 F.3d 1294, 1300 (7th Cir. 1997). Thus, to obtain a preliminary injunction, a movant must first prove that her claim has "at least some merit." <u>Digrugilliers v. Consolidated City of Indianapolis</u>, 506 F.3d 612, 618 (7th Cir. 2007) (citing <u>Cavel International, Inc. v. Madigan</u>, 500 F.3d 544, 547 (7th Cir. 2007)).

Under the Eighth Amendment, a prison official may violate a prisoner's right to medical

care if the official is "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), if it causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

"Deliberate indifference" means that prison officials know of and disregard an excessive risk to inmate health and safety. Farmer, 511 U.S. at 837. Inadvertent error, negligence, gross negligence and ordinary malpractice do not amount to cruel and unusual punishment within the meaning of the Eighth Amendment. Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996); Snipes v. DeTella, 95 F.3d 586, 590-91 (7th Cir. 1996). Thus, disagreement with a doctor's medical judgment, an incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996). Instead, "deliberate indifference may be inferred [from] a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole, 94 F.3d at 261-62.

The Court of Appeals for the Seventh Circuit has held that Gender Identity Disorder

7

constitutes a "serious medical need" for purposes of the Eighth Amendment. Fields v. Smith, 653 F.3d 550, 553 (7th Cir. 2011); Meriweather v. Faulkner, 821 F.2d 408, 413 (7th Cir. 1987). As the court recognized, this disorder presents a serious psychological problem: "A person with GID often experiences severe anxiety, depression, and other psychological disorders . . . [and] may attempt to commit suicide or to mutilate their own genitals." Fields, 653 F.3d at 553. Inmates are not entitled to a particular form of treatment, particularly those that are "esoteric" or "protracted and expensive" and thus "beyond the reach of a person of average wealth." Maggert v. Hanks, 131 F.3d 670, 671–72 (7th Cir. 1997). Nevertheless, an inmate states a claim under the Eighth Amendment by alleging that the defendants "have failed to provide [her] with any kind of medical treatment . . . for her gender dysphoria." Meriweather, 821 F.2d at 413.

After considering the parties' proposed findings, I conclude that it is premature to rule on plaintiff's motion for preliminary injunctive relief. The problem in this case is that even assuming that plaintiff's requests for counseling, shaving items, women's underwear, hormone treatment or placement in an environment giving her a "real life experience as a woman in prison" are bona fide and necessary treatments for Gender Identity Disorder, the court cannot grant plaintiff injunctive relief for treatment because she does have a diagnosis of this disorder.

Of course, a defendant's refusal to examine a prisoner can also be a violation of the Eighth Amendment. See October 4, 2011 Order on Motion for Leave to Proceed, dkt. #5 (". . . plaintiff alleges that prison officials have been refusing to undertake an examination that could result in [a Gender Identity Disorder diagnosis], even though she is suffering from severe

mental anguish. These allegations are enough to support her claims at this point.") Defendants argue that "the undisputed facts show that [plaintiff] is being assessed for GID and, if necessary, treatment recommendation[s] will be made." Dfts.' Br., dkt. #23 at 6. The parties' preliminary injunction submissions are only somewhat useful on this point. The parties dispute whether plaintiff has cooperated with prison staff in allowing an initial interview under the Gender Identity Disorder policy. Defendants explain that they are willing to hold an initial interview with plaintiff and that their consultant, Cynthia Osborne, was planning on coming to the prison in mid-December 2011. However, defendants have not provided any information showing whether these events occurred. In support of her follow-up "motion to grant injunction," dkt. #25, plaintiff includes an inmate grievance from early December 2011 in which she states that her "treatment is already on-going because [she] is being evaluated—I was interviewed a while back and today [December 7, 2011] by Dr. Tobiasz and my referral is going before the G.I.D. committee . . . ." However, as of early January 2012, plaintiff states that defendant Tobiasz has been "stringing [her] along" and she has "deteriorated to acting upon [her] suicidal ideations" by starving herself.

  The dearth of information concerning plaintiff's current treatment under the Gender Identity Disorder policy combined with plaintiff's apparent renewed attempts at self-harm makes it unclear whether plaintiff has a reasonable likelihood of success on the merits or faces irreparable harm. Accordingly, I will give defendants a short period of time in which to supplement their proposed findings of fact and supporting materials (plaintiff has already done so by submitting dkts. ##25 and 26). Defendants will have until February 24, 2012 to

9

respond to plaintiff's new submissions, treating the numbered facts therein as plaintiff's supplemental proposed findings of fact. In responding to plaintiff, defendants should explain how the Gender Identity Disorder policy is being applied to plaintiff and how they have responded to plaintiff's alleged acts of self-harm.

ORDER

IT IS ORDERED that a decision on plaintiff's motions for preliminary injunctive relief, dkts. ##1, 25, is STAYED pending supplemental briefing. Defendants have until February 24, 2012 to respond to plaintiff's supplemental proposed findings of fact, dkts. ##25, 26.

Entered this 15th day of February, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge